OPINION OF THE COURT
James P. Dawson, J.
This matrimonial action was commenced in 1995 with *133 plaintiff seeking a divorce and various ancillary relief including custody of the four minor children of the marriage: A., now age 16, D., now age 14, Dn., now age 11, and R, now age 7.
In a previous order rendered in 1996, the Court granted temporary custody of the four children to the plaintiff and awarded her temporary child support and spousal maintenance. Thereafter, both parties urged the Court to conduct a permanent child custody hearing in advance of the divorce trial, representing that an order of permanent custody likely would limit, if not obviate, the need for a trial. A custody trial was thus held in 1998 and a court-ordered forensic custody examination was conducted resulting in a comprehensive custody and visitation stipulation which was reduced to an order in 1999.
The Present Motion
The defendant now moves to compel DNA testing of the plaintiff and the four children, alleging that on or about August 1998, he heard that plaintiff stated to an unnamed person at an unspecified time that he was not D.’s father. Shortly thereafter, the defendant obtained saliva and/or blood samples from all of the children and had those samples subjected to DNA testing. The results of that DNA testing set forth in the defendant’s moving papers show that three of the four children are statistically not his children. The defendant then located and obtained an affidavit from that unnamed person referenced above, a person now identified as K.B.
The plaintiff opposes the motion insisting that all of the children were fathered by the defendant, alleging that the defendant should be estopped from denying paternity based on his delay in raising the issue and by virtue of his continuing relationship with the children notwithstanding the DNA test results defendant presents. The Law Guardian raises the same issues as the plaintiff and both the plaintiff and the Law Guardian point out that the best interests of the children would not be served by ordering testing.
The Court ordered a hearing to inquire into the best interests of the children upon finding that a genuine controversy existed regarding paternity. The defendant then moved for an order directing a forensic evaluation of the children for use at the hearing which was denied.
*134 The Facts
At this latest hearing, both the plaintiff and. the defendant testified as did a nonparty witness, one M.R. The hearing confirmed that all the children were conceived and born while the parties were married and lived together. The defendant conceded that in a family offense proceeding commenced in Clinton County Family Court in 1995 he accused the plaintiff of being promiscuous during the marriage and revealed that he knew or had reason to believe prior to August 1998 when the custody stipulation was placed on the record that the plaintiff had been unfaithful. The defendant also conceded that he had the DNA test results in his possession not later than December 31, 1998. He further testified that a child care provider/tenant by the name of W.A. told him in August of 1998 that he was not the father of the boys and it was upon learning this news that he gave up his pursuit of custody of the children. W.A. was not, however, called as a witness. The defendant also testified that at the time of the making of the custody stipulation, he was in turmoil and did not decide to make the pending motion until just before it was made. He further testified that in August of 1999 he took A. and D. to a scheduled appointment with a psychologist in Montreal, Canada, to break the news to them that D. was not his child. Defendant’s testimony with respect to this disclosure was that D. was upset but that A. said she already had been told that defendant was not her father. Neither A. nor D. were called as witnesses. Defendant testified that he was of the belief that plaintiff would ultimately tell the children of the circumstances of his nonpaternity but defendant was unable to articulate the basis of that belief. For her part, the plaintiff testified that she had not told any of the children that defendant was not their father. The plaintiff denied making the statement recounted in the affidavit of K.B. attached to defendant’s motion papers. K.B. was not called as a witness. Plaintiff testified that she doubts the reliability of defendant’s DNA evidence and believes that he is the father of the children. Plaintiff testified that both she and defendant have done things of which they are not proud. Defendant opined that the children will be better off “in the long run” knowing the truth regarding their paternity.
Plaintiff testified that as a result of defendant’s disclosure to A. and D. of the DNA test results, the children did not seem devastated but she contended that since they were already so devastated they could not be more devastated. Plaintiff and defendant both testified that the defendant has at all times *135 exercised the full visitation allotted by the permanent custody order and more than it provided respecting A. and D. The defendant, on the other hand, testified that R does not view him as his father. Defendant’s proof on that conclusion is somewhat amorphous.
By the close of the proof, it had become apparent that the Law Guardian had not discussed the issues involved on this motion with the children and conceded as much after he called no witnesses. The Law Guardian told the Court that he felt that discussing the issues with the children would cause more harm to them than was necessary. Since the Court did not feel that the Law Guardian’s position on that issue was entirely correct, he was instructed to talk to A. and D. and report to the Court within two weeks. The Law Guardian reported that he talked to D. in September of 2000 and talked to A. sometime later, and that after those discussions he was still opposed to the testing. The Law Guardian reported that A. did not want to be interviewed by the Court but D. did wish such an interview. The Court, therefore, scheduled an interview with D., advised counsel of it, and invited written questions. Although the defendant’s counsel submitted written questions, plaintiffs counsel did not. The interview was conducted on the record with the Law Guardian present.
The Law
This motion to compel DNA testing is brought pursuant to CPLR 3121 and 4518 as well as Family Court Act § 418 (a). CPLR 3121 provides that where blood relationship is at issue, any party may cause another party and/or the child under the other party’s control to submit to blood examination. The statute contemplates that this relief is available by simple notice as is the case with regard to other discovery devices generally available in CPLR article 31. The statute provides no exceptions although CPLR 3122 provides for objections to disclosure demands made pursuant to CPLR 3121. While that procedure was not followed here, the papers submitted are the functional equivalent of the notice and objections of CPLR 3121 and 3122.
Family Court Act § 418 (a), like CPLR 3121, starts with the presumption that testing is appropriate when there is an issue of paternity but Family Court Act § 418 (a) also provides the substantive framework within which to review the merits of *136 this motion where it is the father seeking to disprove paternity.[1] Unlike CPLR 3121, however, Family Court Act § 418 (a) places limits on the testing in that “[n]o such test shall be ordered * * * upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel or the presumption of legitimacy of a child born to a married woman.”
Most, if not all, of the cases involving paternity of marital children involve an analysis of the best interests of the child. Two of the more recent cases from the Appellate Division, Third Department, are Verra v Bowman-Verra (266 AD2d 682 [3d Dept 1999]) and Mancinelli v Mancinelli (203 AD2d 634 [3d Dept 1994]). While there have been a number of reported cases involving paternity testing of marital children, most of the appellate cases involve procedural issues that arise before the stage this case has reached. This case calls for a determination after a fact-finding hearing of whether the overall best interests of the children is the standard for determination or whether a more limited inquiry of the children’s best interests is the standard. The latter standard would involve primarily a consideration of the parties’ conduct and less a consideration of the children’s best interests. The standard which the Court elects to adopt will most certainly be determinative of the outcome.
It seems fairly clear that the parties will eventually be divorced and that the children will be negatively impacted by that, as is true in many cases. It also seems fairly clear, however, that the children’s overall best interests will be further negatively impacted by the results of genetic marker testing if such testing shows that they are not the defendant’s biological children. The best interests of the children are always, of course, paramount. (Verra, 266 AD2d at 683; Prowda v Wilner, 217 AD2d 287, 290 [3d Dept 1995].) Where there are two “parents” who are ready, willing, and able to provide protection, support, and nurturing, the children will be negatively impacted in some way by the loss of one “parent.” Likewise, it seems fairly clear that unless the “real parent” *137 with whom the children have a positive and subsisting relationship is standing by ready to assume the role of “parent” and provided that this “real parent” is also a person of means and character, genetic marker testing should never be ordered or it would most assuredly negatively impact the children. Indeed, ordering a test which has the potential to bastardize children without settling the issue of paternity may not be in the children’s best interests. (Roth v Evangelista, 248 AD2d 369 [2d Dept 1998].) It seems the relief that the defendant seeks would be available to him only if he is a scoundrel who has never done a good thing for the children and the “real parent” is there for the children. Applying the overall best interests standard could give the scoundrel the benefit of genetic marker testing and deny it to the responsible “parent.” This Court cannot subscribe to an application of the law that leads to such a result and declines to adopt an interpretation of law which holds that the stigma of bastardization compels a conclusion that the motion be denied. Thus, the reasoning set forth in Roth cannot be decisive here else CPLR 3121 would be rendered meaningless.
While allowing that Family Court Act § 418 (a) provides a framework for decision, this Court is not satisfied that the overall statute makes sense. By including the presumption of paternity as a basis for denying testing, for instance, the Legislature seems to have shut the door on a married man who claims he is not the father of a child born during the marriage in every instance.[2] What the Legislature did in enacting Family Court Act § 418 (a) was create a presumption that testing is appropriate and then allow for another presumption, a legal fiction, to overcome the presumption earlier created. For several reasons, the Court is satisfied that the facts of this case do not implicate the presumption of paternity. Similarly, the facts do not implicate the doctrine of res judicata.
The presumption of paternity may be overcome and is not absolute. (Golser v Golser, 115 AD2d 695 [2d Dept 1995] [presumption of legitimacy is one of the strongest and most persuasive in the law, but is nevertheless rebuttable by blood testing].) The defendant has come forward with proof in admissible form — certified medical records — that show he is not the father of three of the four marital children. This is sufficient to overcome the mere presumption of legitimacy even though it *138 has been said that this is one of the strongest presumptions in the law.
As to the issue of res judicata, there is no court order or judgment which would have such preclusive effect that these children are the defendant’s. Although a custody order was made after a hearing, the defendant’s suspicions regarding the children not being his, aside from a general suspicion of the plaintiff’s infidelity, did not arise until August of 1998 and thus cannot implicate the res judicata doctrine. The issue thus remaining for discussion, then, concerns the issue of equitable estoppel and its related best interests consideration.
The plaintiff and defendant have properly centered their efforts on proving that equitable estoppel either does or does not prevent the defendant from obtaining an order for testing. The plaintiff has the burden of showing that the defendant is equitably estopped from denying paternity. (Prowda, 217 AD2d at 289.) The plaintiffs proof regarding equitable estoppel is, at best, sketchy: as early as 1995 in a Family Court proceeding, the defendant accused her of being promiscuous. This lack of proof is quite understandable as otherwise the plaintiff would be in the uncomfortable position of proving that she gave the defendant suspicion to expect that she was promiscuous over the years and would put her in the unenviable position of potentially not being able to take advantage of the equitable estoppel theory based on her duplicity. (Verra, 266 AD2d at 683.) Further, plaintiff has hardly changed her position or detrimentally relied on defendant’s forbearance from exercising his rights to make this motion. Nonetheless, both parties have shown that at least as early as August of 1998 the defendant had serious reservations regarding his paternity but defendant continued to exercise visitation notwithstanding those reservations. The defendant has presented satisfactory proof, however, that he acted on those reservations by obtaining testing and obtaining the test results no later than December of 1998.
The Court is of the opinion that the plaintiff bears the burden of proving facts establishing equitable estoppel in order to prevent the defendant from being awarded the relief sought. In attempting to answer whether the plaintiff has met that burden, the Court has considered two questions. First, did the defendant develop a parental relationship with the children after either 1995 or 1998? He did not. The relationship of parent and child was established by the time defendant had competent evidence. Second, should the defendant have broken off his re *139 lationship with the children upon learning in either 1995 or 1998 that he was not the father of one or more of them? The answer is no. To do so in 1995 would have deprived the children of his parental and financial support on specious evidence, and to do so before December of 1998 would work the same result. In short, it is hard to divine how the delay of 13 to 14 months in bringing this latest motion has negatively affected the children unless, of course, simply bringing the motion at all is wrong. The Court is of the opinion that it has sufficiently addressed that last observation in the foregoing discussion. Clearly, the children will be negatively impacted by a finding that the defendant is not their father, but it is not the defendant’s delay in bringing this motion which has caused that impact.
As such, the Court finds that neither the presumption of legitimacy, the doctrine of res judicata, nor principles of equitable estoppel are sufficient to withhold granting the movant the relief sought. The defendant’s motion is granted and it is so ordered. The plaintiff, defendant, and the four children are directed to submit to genetic marker testing pursuant to the practices and procedures set forth at Family Court Act § 532 (a) as implemented in Clinton County pursuant to that statute or pursuant to an alternative arrangement which may be agreed upon between the parties. The costs of the testing are to be borne by the defendant.

. Family Court Act § 532 also pertains to motions seeking genetic marker testing but that statute is reserved for situations in which paternity is sought to be established!; thus, the substance of that statute and the case law interpreting it are really of no value here where the motion seeks to disprove paternity. (See Matter of Donald FF. v Jennifer FF., 273 AD2d 733 [3d Dept 2000] [article 5 of the Family Court Act does not authorize a proceeding to illegitimize a child].)

. Whether such a provision violates equal protection of the law is an argument which has not been raised and is, therefore, not decided.